ADAM ELLERY HORWITZ, Pro Se

909 N Loop 288

Denton, TX 76209

Tel: (469) 315-7938

horwitzadam880@gmail.com

**FILED**

MAR 0 2 2026

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

# UNITED STATES DISTRICT COURT

## IN AND FOR THE EASTERN DISTRICT OF TEXAS

### SHERMAN DIVISION

| | |
|---|---|
| ADAM ELLERY HORWITZ, an individual, )<br>)<br>    *Plaintiff,* )<br>)<br>)<br>)<br>    v. )<br>)<br>)<br>)<br>CITY OF DENTON, et al. )<br>    (See attached Exhibit A for full list of )<br>Defendants) )<br>)<br>    *Defendants.* )<br>)<br>)<br>) | **Case No:** 4:26CV220 SDJ/BD<br><br>**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**<br><br>**Pursuant to 42 U.S.C. 1983**<br><br><br>**DEMAND FOR JURY TRIAL** |

Complaint

Table of Contents

Table of Authorities …………………………………………………………….. 3

Complaint ………………………………………………………………….. 4

Introduction ……………………………………………………………… 4

Parties ………………………………………………………………..…… 6

Jurisdiction & Venue ………………………………………………………. 10

Factual Background ……………………………………………………….… 11

Causes of Action …………………………………………………………… 20

      1. UNLAWFUL DETENTION  …………………………………………… 21

      2. UNLAWFUL DETENTION  …………………………………………. 22

      3. FABRICATION OF EVIDENCE/INFORMATION …………………………… 25

      4. ARREST WITHOUT PROBABLE CAUSE …………………………………... 27

      5. UNLAWFUL SEARCH …………………………………………….. 29

      6. EXCESSIVE USE OF FORCE ………………………………………... 31

      7. FAILURE TO INTERVENE ………………………………………….. 34

      8. FIRST AMENDMENT RETALIATION ………………………………… 36

      9. RELIGIOUS DISCRIMINATION/EQUAL PROTECTION ……………………. 37

      10. JUDICIAL DECEPTION …………………………………………. 38

      11. FABRICATION OF EVIDENCE ……………………………………. 40

      12. CONSPIRACY …………………………………………………. 41

      13. MONELL LIABILITY  ……………………………………………. 50

      14. PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF …………… 58

**TABLE OF AUTHORITIES**

**CASES**

City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) ........................................ 52

Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985) .............................. 53

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) ........................................ 58

Tower v. Glover, 467 U.S. 914 (1984) ............................................................... 44

**COMPLAINT**

1. Plaintiff Adam Ellery Horwitz, for their complaint against Defendants City of Denton, et al., states as follows:

**INTRODUCTION**

2. On the night of March 2, 2024, Plaintiff ADAM HORWITZ called 911 to get help for their mother during a medical emergency. What followed was a systematic violation of their constitutional rights by officers of the Denton Police Department and personnel of the Denton Fire Department, which culminated in excessive being applied, arrest with no probable cause, and documented perjury in official documents. Plaintiff alleges upon information and belief that this culminated in a conspiracy between city and county officials to present tampered body camera footage during the discovery process.

3. When Plaintiff remained in their mother's bedroom, standing silently against the wall, arms at their sides, posing no obstruction to medical care, DFD personnel falsely radioed dispatch that Plaintiff was "belligerent" and requested an expedited police response. BROCK arrived and, without pause, ordered Plaintiff, who was standing silently against the wall, to leave their mother's room, then physically seized and shoved Plaintiff out before any assessment of the situation had taken place.

4. BROCK then used the opportunity to interrogate Plaintiff's mother about whether Plaintiff had assaulted her, in response to a 911 call Plaintiff had placed for their mother's spinal stenosis and nerve compression causing leg pain and numbness. BROCK and LEONA then stepped outside to confer, leaving Plaintiff alone in the custody of the same firefighter LEONA had minutes earlier threatened would knock Plaintiff unconscious if they moved. Plaintiff remained detained, without arrest, without

4
Complaint

charges, and without recourse. Brock confirmed there were no signs of injury and no probable cause for arrest, and then BROCK returned to Plaintiff's mother's room and LEONA returned to detaining the Plaintiff. During the detainment, Plaintiff asked to be frisked 3 times to call their sister during the family emergency. Each time, LEONA refused.

4. When Plaintiff stood and walked slowly toward their mother's room to pray, officers LEONA and BROCK immediately restrained both of Plaintiff's arms. OFFICER LOPEZ entered and immediately ordered "take him down." LEONA executed a leg-trip takedown on an already-restrained person, then punched them twice on the floor. LOPEZ applied a prone leg lock hold known to cause positional asphyxia, folding Plaintiff's right leg over the left and folding it toward the glutes, maintaining it even as Plaintiff cried out "I can't breathe." LOPEZ applied handcuffs so tightly they left indentations.

5. Afterward, standing in the parking lot, LEONA asked: "What should I charge him with?" BROCK indicated she would follow LEONA to the police station and Googled the charge in her car. At the police station, BROCK looked up the charge on her phone and coached LEONA on how to write it while he was filling out the intake forms.

6. The fabrication did not stop there. LEONA's probable cause affidavit was filled with falsehoods. The DFD Post-Run Report was falsified in a manner that suggested elder abuse, with false claims of "blunt trauma." And when Plaintiff later reviewed discovery materials as a pro se defendant, the body camera footage had been altered — the "what should I charge him with" admission removed,

audio dubbed over, and visual artifacts added, after a complaint Plaintiff had filed with the City Auditor.

7. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 for unlawful detention, false arrest, excessive force, fabrication of evidence, conspiracy, and the presentation of tampered discovery materials as genuine.

**PARTIES**

8. Plaintiff ADAM HORWITZ is an individual residing in Denton, Texas. Their address is 909 N Loop 288, Denton, TX, 76209. Their phone number is 469-315-7938, and email address is horwitzadam880@gmail.com.

9. Defendant CITY OF DENTON is a municipal corporation. Under the Denton City Charter, City Manager Sara Hensley is the final policymaker for the City regarding the administration, discipline, and oversight of the Denton Police Department (DPD) and Denton Fire Department (DFD). The City Manager was provided actual notice of criminal misconduct and evidence tampering on July 28, 2025, and October 28, 2025. The City is liable for the constitutional deprivations described herein because they resulted from the City's official policies, customs, and acts of ratification. Its Final Policymaker, after being put on actual notice of criminal police misconduct and evidence tampering, ratified the unconstitutional "within policy" determination of her subordinates. The City Manager, Sara Hensley, can be located at 215 E. McKinney St., Denton, TX 76201. Their phone number is (940) 349-8307, and email address is Sara.Hensley@cityofdenton.com.

10. Defendant DENTON COUNTY is a political subdivision of the State of Texas and is the public entity responsible for the Denton County District Attorney's Office. The Honorable Andy Eads is the County Judge. Judge Eads' phone number is 940-349-2820, address is 1 Courthouse Dr Suite 3100, Denton, TX 76208, and email address is Andy.Eads@dentoncounty.gov.

11. Defendant OFFICER EVAN LEONA was a police officer for DPD. He is sued both in his individual and official capacity. At all times relevant to this Complaint, LEONA was an employee of the Denton Police Department acting under color of state law in the capacity of police officer. He is currently employed by the Frisco Police Department. He can be reached at the address 7200 Stonebrook Pkwy, Frisco, TX 75034, by telephone at (972) 292-6010, email at klee1@friscotexas.gov. Contact information provided is for the Frisco Police Department, where he can reasonably be found for purposes of serving process.

12. Defendants OFFICER KRISTINA BROCK, OFFICER JULIAN LOPEZ (Badge No. #1406), OFFICER MATTHEW KANIA, OFFICER MATTHEW KRAUSS, OFFICER TIFFANY HUPP (Badge No. #1271), OFFICER SEAN WOOLEY, OFFICER VILLANUEVA, OFFICER LUNA, OFFICER WEBER, OFFICER CHRISTOPHER REED, and OFFICER CHANCE REED, are police officers for DPD. They are sued in their individual capacities and official capacities. At all times relevant to this Complaint, Defendants BROCK, LOPEZ, KANIA, KRAUSS, HUPP, REED, LUNA, VILLANUEVA, WEBER, and WOOLEY were employees of the Denton Police Department acting under color of state law in their capacity of police officers. They can be reached at 601 East Hickory Street, Denton, TX 76205, by telephone at (940) 349-8181, or Tony.Salas@cityofdenton.com. Contact

information provided is for the Denton Police Department, where they may reasonably be found for purposes of serving process.

13. Of Defendants OFFICER CHRISTOPHER REED and OFFICER CHANCE REED, only one is the officer identified as 'C. Reed' in the incident report for the March 2, 2024 incident. Plaintiff is unable to determine which individual prior to discovery of officer assignment records. Both are sued in their individual and official capacities.

14. Defendants NICHOLAS DIETER, PAUL TUTTLE, NICOLAS SMITH, JOHNATHON PIATT, and JAMISON ARMSTRONG are DFD personnel (Engine 8 and Medic 8). At all times relevant to this Complaint, Defendants DIETER, TUTTLE, SMITH, PIATT and ARMSTRONG were employees of the Denton Fire Department acting under color of state law in their capacity as firefighters/medics. They are sued in their individual capacities and official capacities. They can be reached at 3113 Colorado Boulevard Denton, TX 76210. Phone number, (940) 349-8108. Email, Kenneth.Hedges@cityofdenton.com. Contact information provided is for the Denton Fire Department Engine 8, where they may reasonably be found for purposes of serving process.

15. Defendant Paul Johnson is the District Attorney for Denton County, sued in his individual and official capacity as the final policymaker regarding evidence management and prosecution. At all times relevant to this complaint, JOHNSON was acting under color of state law in the capacity of District Attorney of Denton county. He can be reached at 1450 E McKinney Street Suite 3100, Denton, TX 76209. Phone number, 940-349-2600. Email, paul.johnson@dentoncounty.gov.

16. Defendant Cecilia Weigel is an Assistant District Attorney for Denton County, sued in her individual and official capacity. At all times relevant to this complaint, WEIGEL was acting under color of state law in the capacity of prosecutor.  She can be reached at 1450 E McKinney Street Suite 3100, Denton, TX 76209. Phone number, 940-349-2600. Email, cecilia.weigel@dentoncounty.gov.

17. Defendants BURSON, RAVEN, MARTIN, and KEIM are investigators with the Denton County District Attorney, sued in their individual and official capacities. At all times relevant to this complaint, BURSON, RAVEN, MARTIN, and KEIM were acting under color of state law in the capacity of investigators. They can be reached at 1450 E McKinney Street Suite 3100, Denton, TX 76209. Phone number, 940-349-2600.

18. Defendants KEVIN HINZMAN and CRAIG FLORY are attorneys with the Denton law firm, Hinzman and Flory, PLLC, sued in their individual capacities. At all times relevant to the conspiracy portion of this complaint, HINZMAN and FLORY were acting under color of state law in the capacity of attorneys who had colluded with prosecutors to violate Plaintiff's constitutional rights. They can be reached at 301 Dallas Dr #101, Denton, TX 76205. Their phone number is (940) 591-8597.

19. Defendant SARA HENSLEY is the City Manager and Final Policymaker for the City of Denton. She is sued in her individual and official capacity. At all times relevant to this complaint, HENSLEY was acting under color of state law in the capacity of City Manager. She can be reached at: 215 E. McKinney St., Denton, TX 76201. Phone: (940) 349-8307. Email: sara.hensley@cityofdenton.com

Complaint

20. Defendant MACK REINWAND is an attorney for the City of Denton. He is sued in his individual and official capacity. At all times relevant to this complaint, REINWAND was acting under color of state law in the capacity of City Attorney. He can be reached at: 215 E. McKinney St., Denton, TX 76201. Phone: 940-349-8333. Email: mack.reinwand@cityofdenton.com

21. Defendants DOES 1-5 are employees of the Denton City Attorney's office, sued in their individual and official capacities. At all times relevant to this complaint, DOES 1-5 were acting under color of state law in the capacity of attorneys or employees.

22. Defendants DOES 6-10 are employees of the Denton Police Department, sued in their individual and official capacities. At all times relevant to this complaint, DOES 1-5 were acting under color of state law in the capacity of employees or evidence technicians in the Civil Liability team.

23. Defendants are sued in their individual capacities for damages and official capacities for injunctive relief.

**JURISDICTION & VENUE**

24. Jurisdiction is proper in the United States District Court for the Eastern District of Texas pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4), et.seq, as the case is one of federal question, involving civil rights violations committed under color of law.

Complaint

25. Venue is proper in the United States District Court for the Eastern District, Sherman Division pursuant to 28 U.S. Code § 124 because the acts or omissions which form the basis of the Plaintiff's claim occurred in Denton, Texas.

## FACTUAL ALLEGATIONS

### The 911 Call and Initial Contact

26. On March 2, 2024, Plaintiff ADAM HORWITZ called 911 to request emergency medical services for their mother, who was experiencing a severe medical crisis involving spinal stenosis and nerve compression. Earlier that day, her leg had given out while playing a bean bag game at the apartment gym.

27. Upon arrival, EMS personnel requested Plaintiff leave the room. Plaintiff remained in the room but positioned themselves against the wall with their hands at their sides, neither physically nor verbally obstructing medical care.

28. DFD personnel radioed dispatch claiming Plaintiff was "belligerent" and requested an "expedited" police response. This was contradicted by body camera footage showing Plaintiff standing silently, back to the wall.

### Initial Detention and Threats of Violence

Complaint

29. Officer KRISTINA BROCK arrived on the scene, DFD told her that they were getting an "abusive vibe" from Plaintiff. When BROCK entered the home, Plaintiff was still standing against the wall observing the treatment of mother. BROCK asked Plaintiff to leave their mother's room. Plaintiff peaceably questioned this command. BROCK then physically seized the Plaintiff, and pushed them from the room.

30. Officer EVAN LEONA appeared on the scene as Plaintiff was pushed out of the room, grabbed and pushed Plaintiff, ordered Plaintiff to sit in a purple chair in the living room. LEONA and a large firefighter hovered over Plaintiff.

31. Brock stayed in mother's room and began questioning her. During the questioning, FD asked if Plaintiff had stabbed her and examined her for injuries.

32. Leona began questioning Plaintiff in the living room. LEONA threatened physical violence, saying "I'm just going to ask you some information ok. Don't jump up or do anything stupid because this guy over this big dude's gonna knock you out alright," referring to a large firefighter, who smiled. A second firefighter with a mustache (JOHN DOE #2) actively participated in this intimidation by joking, "We'll be carrying him around," implying Plaintiff would be unconscious or incapacitated.

33. LEONA continued questioning Plaintiff, then BROCK left mother's room. LEONA said "Don't get up or anything ok, or this guy's gonna make you sit down," and followed BROCK right outside the front door.

34. The large firefigher remained standing over the chair where Plaintiff sat, while LEONA conferred with BROCK. Brock had been questioning Melanie Horwitz in the other room. BROCK determined there was no cause to arrest Plaintiff for assault and said there were "no visible injuries."

## Continuing Detention

35. After confirming with Officer Brock that there was no cause to arrest Plaintiff, Leona went back inside. Yet, Plaintiff remained detained by LEONA and the firefigher. Leona refused to let Plaintiff call relatives, on the grounds that Plaintiff had not been frisked. Plaintiff asked to be frisked 3 times to call relatives during the family emergency. Each time LEONA refused.

## Assault and Excessive Force

36. Plaintiff overheard that paramedics were transporting their mother to hospital and that her blood pressure was low. Plaintiff asked repeatedly to accompany their mother to the hospital, was refused. Officers wouldn't tell Plaintiff what was wrong with their mother specifically or where she was being transported to. Plaintiff stood, up with eyes closed and began to pray. Plaintiff began to walk slowly to mother's room and was apprehended by both LEONA and BROCK, who had restrained both of Plaintiff's arms. A third officer entered the room and approached Plaintiff from the front.

37. Officers HUPP and LOPEZ arrived on the scene, upon entering the apartment LOPEZ immediately tapped Leona on the shoulder and stated, "take him down." While Plaintiff was already restrained by multiple officers, Defendant LEONA performed a leg-trip takedown, forcing Plaintiff to

the ground. LEONA then restrained Plaintiff from behind while Plaintiff was rolled on their left side, while BROCK held onto Plaintiff's right arm and LOPEZ held on to Plaintiff's legs, crossing one foot over the other.

38. At 21:55:33 Defendant LEONA delivered a closed-fist strike (punch) to Plaintiff's torso. At 21:55:43, an officer said to LOPEZ "What do you need bud?" LOPEZ said, "Uh we're good right now." LEONA punched Plaintiff again and said "Stop it Adam!" Plaintiff was surrounded by officers BROCK, REED, WOOLEY, KANIA, and LOPEZ. Defendant LOPEZ held onto Plaintiff's legs, which were not moving, crossed one of the other, and shoved them into Plaintiff's back, forcing their heels toward their glutes and compressing their diaphragm and abdomen. Plaintiff shouted, "I can't breathe!" Defendants maintained the asphyxiating position while handcuffing Plaintiff.

39. During the assault, multiple officers and DFD personnel remained on the scene and failed to intervene to protect the Plaintiff from the clearly excessive force and respiratory distress (positional asphyxia) they witnessed.

40. LOPEZ applied handcuffs with excessive tightness. Despite Plaintiff's complaints of numbness, Defendants BROCK, LEONA, and REED refused to adjust them. The handcuffs were so tight they left deep physical indentations on Plaintiff's wrists.

41. At this time, Plaintiff was face down on the floor saying "I love you mom, I love you mom." LEONA said, "fuckin idiot."

42. Officers Krauss and Brock performed a frisk and led Plaintiff inside LEONA'S police vehicle.

**Post-Arrest Fabrication of Charge**

43. While Plaintiff was handcuffed in LEONA's vehicle, LEONA stood in the parking lot with LOPEZ in front of the apartment.

44. HUPP approached and asked "what happened?" LOPEZ said "I just showed up and like Adam, Adam, you're gonna go to jail, they kept pushing him, I was like fuck it let's just take him down"

45. HUPP asked, "because he wanted to visit his mom, and-"

46. LEONA interrupted and said, "it's possible elder abuse. He wouldn't them treat- help the mom, so we had to push him out of the room, then he still wouldn't calm down, then when he found out he wasn't going in the ambulance he stood up and tried to fight us and that's what happened"

47. HUPP asked, "When they found out she was going in the ambulance, he tried to fight you?"

48. LEONA said, "Because he wanted to go in the ambulance with her"

49. HUPP asked, "and they said no?"

50. LEONA said "Yeah obviously," then LEONA and LOPEZ laughed.

51. (Note: Body-worn camera footage shows Plaintiff merely walked slowly to their mother's room and at no point utilized force or threats against officers.)

52. BROCK and KRAUSS showed up. LEONA then asked BROCK, "**What should I charge him with?** Just uh interference with medical personnel?"

53. BROCK began walking to her car, and indicated she would follow LEONA to the police station. HUPP and LOPEZ remained standing.

54. LEONA then asked LOPEZ, "is that the code?" LOPEZ (who was not even present during the alleged interference) said "Yeah he was interfering with emergency duties."

55. BROCK entered her police vehicle and began searching for "Interfering with Public Duties" on her cell phone. BROCK followed LEONA to the police station. At the police station, BROCK looked up the charge on her cell phone and coached LEONA on how to write it for his report.

**False Documentation**

56. The sworn probable cause affidavit written by LEONA contained multiple false statements, including that firefighters pointed at Plaintiff's waistband to indicate a weapon, that Plaintiff "lunged"

toward their mother's room, Plaintiff was reaching for a weapon, and that LEONA believed Plaintiff to have a weapon, and that Plaintiff was obstructing medics/firefighters. LEONA further omitted that Plaintiff was already restrained by multiple officers at the time of the use of force incident, as well as LOPEZ's "take him down" comment.

57. In LEONA's Case Report Form for the incident, the fields for "evidence" and "case summary" are blank. The witness list is also blank.

58. Additionally, the DFD Post-Run Report was later finalized with multiple false or misleading statements—including that Plaintiff was "belligerent," that the cause of the leg pain was "blunt trauma," that "she [Melanie Horwitz] started to become clear that her son had been pushing her around the house and she was being abused," and "dpd had to take the son to the ground and apprehend him," omitting that Plaintiff was restrained by 3 officers at time of the use of force incident.

**Prosecution**

59. On February 14, 2025, Plaintiff submitted a written complaint to the Denton Police Department about the arresting officer, noting excessive force concerns. On or about February 21, 2025 Plaintiff submitted a litigation hold notice to the Denton Police Department regarding the March 2 incident, and a criminal complaint to the Denton County District Attorney regarding the same.

60. On March 5th, 2025, Plaintiff contacted Chief Investigator Mike Sparby from the Denton County District Attorney's office. Plaintiff asked Inv. Sparby to investigate the incident and emailed

him a copy of the February 21 District Attorney's complaint. First, Inv. Sparby stated that they would not investigate because they only investigate events that occur in Denton County. After Plaintiff reiterated that the event occurred in Denton County, Inv. Sparby stated that the Denton County District Attorney would not investigate the incident, with the stated reason that they were not an investigative agency. Six days later, on March 11, 2025- over one year after the incident- intake attorney Carol Kovac notified Plaintiff that charges were being filed in Plaintiff's case.

61. Plaintiff briefly had court-appointed counsel, Kevin Hinzman, but he withdrew after Plaintiff asked him to put his legal position in writing. On Plaintiff's first court date (April 1), Plaintiff made a pro se appearance. ADA Cecilia Weigel brought up the litigation hold notice in open court, in front of the judge.

## Evidence Tampering

62. On May 20, 2025, Plaintiff submitted a complaint to the Denton City Auditor (Madison Rohrschach) about the incident. The complaint included descriptions of body camera footage viewed with attorney Hinzman on March 27, 2025, such as the leg-trip and LEONA's 'what should I charge him with?' admission. It also contained allegations based on Plaintiff's own recollection, including that Plaintiff was subjected to repeated unexplained arm-lifting during booking, which Plaintiff experienced as harassment. Plaintiff explicitly stated in the complaint that Plaintiff identifies more as female than male in their psyche and shaves their underarms. Per the City Auditor, on May 21, 2025, a representative from the City Attorney's office was briefed on the contents of this complaint.

63. The discovery footage subsequently provided to Plaintiff does not clearly reflect the repeated lifting described in the City Auditor complaint. Plaintiff cannot determine whether this discrepancy reflects a gap in Plaintiff's recollection, an edit to the footage, or both.

64. On June 11, 2025, Plaintiff began viewing discovery materials at the District Attorney's office. The materials were heavily doctored, but were presented by investigators and Assistant District Attorney Cecilia Weigel as being genuine.

65. On June 20, 2025, Plaintiff viewed LEONA bodycamera footage and noticed that the "what should I charge him with" admission was removed at 22:01:25. Additionally, what appeared to be digitally inserted hair artifacts on Plaintiff was noticed in the LEONA footage, during the booking procedures, which disappeared when Plaintiff moved and reappeared when Plaintiff stood still.

66. On July 10, Plaintiff viewed BROCK's bodycamera footage ("Brock bodycam 1") and documented that at 22:01:25, instead of saying "what should I charge him with?" LEONA's lips move for 2 seconds and no sound comes out. Additionally, Plaintiff documented that there were subtle differences in the edits between BROCK's and LEONA's footage, in the parking lot dialogue concerning what to charge Plaintiff with. In BROCK's version, she doesn't shout "yup!" when turning around as in Leona's version- instead, she indicates she will follow Leona, and starts running to her vehicle.

67. On July 25, Plaintiff viewed BROCK's bodycamera footage ("Brock bodycam 2"), which contained a version of the dialogue between BROCK and LEONA at the police station that differed

from that of LEONA's bodycamera footage of the incident. In this video, no digitally inserted hair artifacts were added to Plaintiff, even though it covered the same scene (booking).

68. Despite the obvious alterations, Assistant District Attorney Cecilia Weigel and Investigator Keim claimed that the materials were unaltered.

69. Upon information and belief, the digital alterations to the BWC footage were performed by JOHN DOES 5-10, members of the Denton Police Department assigned to the Civil Liability Response team. Pursuant to General Order 401.8, the Civil Liability Response team acts exclusively under the direction of the Department's legal counsel in anticipation of potential civil litigation.

70. Upon information and belief, Defendant REINWAND, acting as legal counsel for the Department pursuant to G.O. 401.8, directed the digital alterations at the instruction of, or with the authorization of, Defendant HENSLEY. HENSLEY, as City Manager, maintains direct supervisory authority over the City Attorney's office and the Civil Liability Response team.

71. Both HENSLEY and REINWAND received actual written notice of the digital alterations on July 28, 2025 and October 28, 2025.

**CAUSES OF ACTION**

# FIRST CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### 4th Amendment (Unlawful Detention)

### Against Defendants: Brock

72. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

73. Plaintiff had firmly established right under the Fourth Amendment to be free from unreasonable seizure.

74. A detention without reasonable suspicion that a citizen has committed a crime violates the Fourth Amendment prohibition on unreasonable searches and seizure.

75. Before Brock seized Plaintiff, Plaintiff had been standing silently near the door, back to the wall. Yet, Brock performed no independent investigation before using force. Any reliance by BROCK on the DFD's radio report of 'belligerence' was objectively unreasonable because her own immediate observations upon entering the room—seeing Plaintiff standing silently and non-threateningly against the wall—directly contradicted that report, moreover, 'belligerence' is vague and not an articulable fact required for reasonable suspicion, and not even a crime, besides. Based on the totality of the circumstances, there was no reasonable suspicion of a crime.

76. Plaintiff was "seized" within the meaning of the Fourth Amendment because Defendant Brock physically seized and removed the Plaintiff from the room without a warrant or reasonable suspicion that a crime had been committed. BROCK cannot claim that she had reasonable suspicion that Plaintiff had interfered with public duties, because she did not even investigate this alleged offense, and further, had to look up the charge on her phone after the arrest. Instead, she investigated elder abuse based on a "abusive vibe" from a firefighter. However, a "vibe" is not a substitute for articulable facts required for reasonable suspicion.

77. Plaintiff was seized without lawful basis, reasonable suspicion, probable cause, or warrant, or any recognized exceptions thereto, or justification or excuse, and it was therefore an unreasonable seizure.

78. As a result of Defendant OFFICER BROCK's actions, Plaintiff suffered a constitutional injury, namely loss of fourth amendment rights, in addition to loss of liberty, emotional distress, and physical injury.

**SECOND CAUSE OF ACTION**

**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

**4th Amendment (Unlawful Detention)**

**Against Defendants: City of Denton, Leona, DIETER, TUTTLE, SMITH, PIATT,**

**ARMSTRONG**

79. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

80. At all times relevant, Defendants OFFICER LEONA, and DIETER, TUTTLE, SMITH, PIATT, and ARMSTRONG were acting under color of state law in their capacities as police officer and firefighters, respectively.

81. 42 U.S.C.§ 1983 provides in part:

"Every person who, under color of any statue, ordinance, regulation, custom, or usage of any State or Territory subjects, or causes to be subjected, any person of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit at equity or other proper proceeding for redress."

82. Plaintiff had firmly established right under the Fourth Amendment to be free from unreasonable seizure.

83. A detention without reasonable suspicion that a citizen has committed a crime violates the Fourth Amendment prohibition on unreasonable searches and seizure.

84. Plaintiff was "seized" within the meaning of the Fourth Amendment because Defendant Leona ordered Plaintiff to remain in a chair and threatened the use of physical force by **DIETER, TUTTLE, SMITH, PIATT, or ARMSTRONG**, and that **DIETER, TUTTLE, SMITH, PIATT, or**

**ARMSTRONG** stood over the chair where Plaintiff sat. Under the totality of the circumstances, a reasonable person in Plaintiff's position would not have felt free to leave or terminate the encounter.

85. (According to the Post-run/Call report provided to Plaintiff, the firefighter in question is one of DIETER, TUTTLE, SMITH, PIATT, or ARMSTRONG, all of whom were present on scene as members of Engine 8 and Medic 8. Plaintiff is unable to identify the specific individual prior to discovery of crew assignment records and body camera footage.)

86. An officer may stop and briefly detain a citizen based on a reasonable suspicion of involvement in a crime. Here, Plaintiff continued to be detained even after OFFICER BROCK conferred with OFFICER LEONA that there was no evidence Plaintiff had committed a crime aside from Plaintiff being "nervous" during a family emergency, which one would reasonably expect a concerned family member to be.  A "vibe" or a conclusory label like "nervous" is not a substitute for articulable facts required for reasonable suspicion. During this detainment, Plaintiff was prevented from moving or calling relatives during a family emergency.

87. It cannot be credibly claimed that LEONA and BROCK suspected Plaintiff of having committed interference with public duties, to justify the detainment. This crime was not investigated, by either BROCK or LEONA. Rather, both Defendants investigated the claim of suspected elder abuse, even after a physical examination and Plaintiff's mother made it clear that it did not occur.  BROCK had to look up the interference charge on her phone after the arrest, and LEONA didn't know how to write the charge without BROCK's assistance. Even LEONA's affidavit, which contains perjury, does

not attempt to claim that there was a suspicion of interference with public duties during the detainment. Nor did LEONA investigate that crime during the interview with Plaintiff during the detainment.

88. Plaintiff was seized without lawful basis, reasonable suspicion, probable cause, or warrant, or any recognized exceptions thereto, or justification or excuse, and it was therefore an unreasonable seizure.

89. As a result of Defendants' actions, Plaintiff suffered a constitutional injury, namely loss of fourth amendment rights, in addition to loss of liberty, emotional distress, and physical injury.

**THIRD CAUSE OF ACTION**

**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

**4th Amendment, 14th Amendment (Fabrication of Evidence/Information) against**

**Defendants: City of Denton, DIETER, TUTTLE, SMITH, PIATT, ARMSTRONG**

90. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

91. Plaintiff has a clearly established right under the Fourth and Fourteenth Amendments to be free from deprivations of liberty based on fabricated information and false reports by government officials.

Complaint

**92. DIETER, TUTTLE, SMITH, PIATT, and ARMSTRONG** intentionally, and with reckless disregard for the truth, fabricated material reports to law enforcement, specifically stating that Plaintiff was "belligerent."

93. Based on these falsehoods, **DIETER, TUTTLE, SMITH, PIATT, and ARMSTRONG** requested that police "expedite" their response. This was a calculated move to ensure an immediate, high-tension seizure of the Plaintiff without a preliminary investigation.

**94. DIETER, TUTTLE, SMITH, PIATT, and ARMSTRONG** knew this information was false at the time it was stated, as Plaintiff was standing silently, non-threateningly, and not interfering with any medical duties.

**95. DIETER, TUTTLE, SMITH, PIATT, and ARMSTRONG** provided this false information for the express purpose of inducing the police to seize the Plaintiff and remove Plaintiff from the premises without a warrant or lawful basis.

**96. DIETER, TUTTLE, SMITH, PIATT, and ARMSTRONG's** fabrications were a proximate cause and a substantial factor in the Plaintiff's subsequent seizure. While the they had an independent duty to assess the scene, the intentional falsehoods were designed to, and did, corrupt the "totality of the circumstances" assessment, making the resulting constitutional violation a foreseeable consequence of the lie.

97. As a result of these fabrications, Plaintiff was deprived of liberty, suffered physical pain from the resulting use of force, and experienced severe emotional distress.

## FOURTH CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### 4th Amendment (False Arrest) against

### Defendants: LEONA, BROCK, LOPEZ, REED, KRAUSS

98. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

99. Plaintiff had a clearly established right under the Fourth Amendment to be free from arrest without probable cause and to be free from unreasonable seizures executed through excessive force.

100. Defendants arrested Plaintiff without a warrant or probable cause. The arrest was objectively unreasonable and lacked a lawful basis for the following reasons:

a) Pre-Determination of Force: Immediately upon entering, Defendant LOPEZ ordered "take him down" before any criminal conduct was observed or any investigation into "interference" occurred.

b) Use of Excessive Force as a Means of Arrest: The arrest was executed through a leg-trip takedown, closed-fist strikes, and a prone "hogtie"-style leg lock that caused respiratory

distress.  Executing an arrest with excessive force on a non-resisting subject renders the entire seizure unreasonable under the Fourth Amendment.

c) Post-Arrest Charge Shopping: Body camera footage captured LEONA asking, "What should I charge him with?" after the physical arrest was complete.  This demonstrates the arrest preceded any determination of a crime.

d) Lack of Probable Cause for Interference: Defendants did not investigate "Interference with Public Duties" (Tex Pen § 38.15) during the detention. Attempting to pray or speak with one's mother during a family emergency one called 911 for does not meet the "criminal negligence" element of the statute.

e) Admission of No Cause: Shortly before the use of force, LEONA admitted Plaintiff would be "free to go" once EMS left, proving there was no existing probable cause for an arrest. And before that, BROCK had stated to LEONA that "we don't have enough to take him."

f) Fabricated Evidence: The probable cause affidavit by LEONA contained perjury, including false claims contradicted by body camera footage that Plaintiff "lunged," that firefighters signaled that Plaintiff possessed a weapon, and crucially, that Plaintiff "was in the way while paramedics were trying to evaluate her" – a statement disproven by BROCK's body camera footage, which shows Plaintiff standing against the wall. LEONA's body camera shows that LEONA entered the home as BROCK pushed Plaintiff out of the bed room, and did not witness Plaintiff interfering with anything. LEONA's body camera footage, from his arrival at the

Complaint

apartment to booking Plaintiff into jail, does not contain any conversations where any officers or firefighters claim Plaintiff had interfered, either.

101. OFFICER LOPEZ initiated the arrest by ordering the takedown and applying an asphyxiating hold, then later applied handcuffs.

102. OFFICER LEONA executed the takedown, used strikes, and authored the fraudulent affidavit.

103. OFFICER BROCK participated by restraining Plaintiff's arm during the force incident, leading Plaintiff into LEONA's vehicle, and coaching LEONA on a charge she had to find on her cell phone.

104. OFFICER REED participated by escorting Plaintiff inside the police station and refusing to adjust the handcuffs when Plaintiff asked, after they had arrived to the police station.

105. OFFICER KRAUSS further participated by frisking Plaintiff and leading Plaintiff to LEONA's vehicle.

106. As a result of this False Arrest, Plaintiff suffered loss of liberty, physical injury, and severe emotional distress.

## **FIFTH CAUSE OF ACTION**

Complaint

**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

**4th Amendment (Unlawful Search)**

**Against Defendants: Leona, Brock, Villanueva, Luna, Weber, Krauss**

107. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference, particularly, Count 3.

108. Plaintiff had firmly established right under the Fourth Amendment to be free from unreasonable searches.

109. A search without probable cause that a citizen has committed a crime violates the Fourth Amendment prohibition on unreasonable searches and seizure.

110. Plaintiff was searched twice under the meaning of the 4th Amendment. First, KRAUSS and BROCK led Plaintiff, then handcuffed, to LEONA's police vehicle, and conducted a body search before loading Plaintiff into the vehicle. Then, LEONA, BROCK, VILLANUEVA, and LUNA conducted a strip search during jail booking procedures. BROCK and LEONA ordered Plaintiff to disrobe and so LEONA and CURTIS could take pictures of marks left by LEONA's punches.

111. OFFICER LEONA had asked "what should I charge him with?" after the arrest, and asked for assistance writing the charge. At the time of arrest, Plaintiff had not committed a crime. The unlawful "searches" of Plaintiff, upon their arrest, and separately upon being jailed, were therefore without lawful basis, reasonable suspicion, probable cause, or warrant, or any recognized exceptions

thereto, or justification or excuse, and were thus unreasonable and in violation of Plaintiff's Fourth Amendment rights.

112. As a result of Defendant OFFICER BROCK's actions, Plaintiff suffered a constitutional injury, namely loss of fourth amendment rights, in addition to loss of liberty, emotional distress, and physical injury.

## SIXTH CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### 4th Amendment (Excessive Use of Force)

### Against Defendants: Leona, Lopez, Brock, Reed

113. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

114. Plaintiff had a clearly established right to be free from force that is "objectively unreasonable" under the Fourth Amendment. This includes the specific right of a restrained, non-resisting subject to be free from strikes, takedowns, and life-threatening asphyxiating holds.

115. The severity of a crime could not have been a factor, because LEONA did not even have probable cause that Plaintiff had committed a crime. Per LEONA's own admissions ("what should I charge him with?", and Plaintiff being "free to go" after the officers left) the use of force and arrest came first, and the alleged "probable cause" of having committed a crime, later. Plaintiff was simply

attempting to see their mother before she was transported to the hospital- not committing a violent crime, or any crime for that matter.

116. The probable cause affidavit further demonstrates the force was an act of bad faith rather than a response to a crime. If a valid, lawful reason for the force existed, misrepresentations in the affidavit would not be necessary:

a) LEONA's claim that Plaintiff "lunged" or "ran into" officers is a fabrication designed to justify excessive force; body camera footage shows Plaintiff walking slowly

b) LEONA's claim that he believed Plaintiff had a weapon and was reaching for it is belied by the fact that LEONA refused Plaintiff's three prior requests to be frisked.

c) LEONA claimed Plaintiff was "resisting commands." Video shows LEONA delivered the first punch (characterized as a "distraction blow") in total silence, and ambiguously shouting "Stop it Adam!" during the second strike without further instruction of how Plaintiff was supposed to "comply."

d) LEONA's account also completely omits LOPEZ's "take him down" instruction which directly preceded the excessive use of force.

117. Furthermore, no reasonable officer on the scene would have considered that Plaintiff, who was already restrained by 3 officers at the time of the use of force incident and was simply trying to see

Complaint

their mother during a medical emergency, posed an immediate safety threat requiring a leg-trip takedown. And following the leg-trip takedown, Plaintiff was restrained by multiple officers, and could not, by any stretch of the imagination constitute a "threat" warranting multiple punches and asphyxiation.

118. Defendant LEONA executed a leg-trip takedown on Plaintiff while Plaintiff's arms were already immobilized and held by multiple officers.

119. While Plaintiff was mounted on the floor by LEONA, with one arm under the Plaintiff's body, one arm held by BROCK, and both of Plaintiff's legs restrained by LOPEZ, LEONA delivered multiple closed-fist strikes. The use of strikes and takedowns on a restrained subject who is not a threat is a flagrant violation of the Fourth Amendment.

120. Defendant LOPEZ's conduct evidenced a specific intent to inflict pain and a reckless disregard for Plaintiff's life:

a) Upon entering, LOPEZ ignored the actual status of the scene and shouted "take him down." LOPEZ denied another officer's offer of assistance, choosing instead to personally apply a high-risk prone "hog tie"-style hold.

b) LOPEZ folded Plaintiff's legs backwards, compressing Plaintiff's diaphragm while Plaintiff was already pinned and being struck by LEONA. LOPEZ maintained this hold even as Plaintiff gasped, "I can't breathe."

c) LOPEZ himself said on camera "we're good right now" when asked if any assistance was needed, just seconds before LEONA punched Plaintiff more and LOPEZ began asphyxiating Plaintiff.

d) LOPEZ applied handcuffs with extreme and unnecessary tightness, causing immediate numbness. Despite Plaintiff's verbal notifications of pain and loss of circulation, Defendants BROCK, LEONA and REED refused to adjust the restraints. This resulted in prolonged nerve compression and physical indentations that persisted after the encounter. This continued application of force after Plaintiff was fully subdued was purely punitive.

121. As a direct and proximate result of Defendants' actions, Plaintiff suffered physical injury, constitutional injury- namely loss of fourth amendment rights- in addition to loss of liberty, and emotional distress.

## SEVENTH CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### 4th Amendment (Failure to Intervene)

### Against Defendants: BROCK, REED, WOOLEY, KRAUSS, HUPP, KANIA

122. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

123. Plaintiff had a clearly established right to be free from force that is "objectively unreasonable" under the Fourth Amendment.

124. OFFICER BROCK, and all other officers present, including WOOLEY, REED, KANIA, KRAUSS, and HUPP, had a clearly established duty to intervene to prevent the use of excessive force by fellow officers.

125. BROCK was in immediate physical contact with Plaintiff, holding Plaintiff's arm while LEONA delivered strikes and LOPEZ applied an asphyxiating hold. BROCK heard Plaintiff's cries of distress and witnessed the lack of resistance, giving her actual knowledge that the force used was unconstitutional. The other defendants surrounded Plaintiff during this encounter, and witnessed clearly excessive force being applied against a restrained subject.

126. BROCK had a continuous and reasonable opportunity to intervene throughout the prolonged assault. Instead, she chose to facilitate the force by physically restraining Plaintiff's arm. All other officers present had a continuous and reasonable opportunity to intervene throughout, but did not.

127. BROCK and all officers present, including REED, KANIA, WOOLEY, KRAUSS, and HUPP did not attempt to de-escalate, did not order the release of the prone hold, did not prevent punches on Plaintiff, and did not otherwise intervene, despite having the proximity to do so.

**EIGHTH CAUSE OF ACTION**

**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

**1st Amendment (Retaliation)**

**Against Defendants: LEONA**

128. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

129. Plaintiff has a clearly established right to be free from retaliation for First Amendment expression, including religious prayer.

130. On March 2, 2024, Plaintiff was engaged in the high-level protected activity of religious exercise and silent prayer at their mother's residence, during a family emergency.

131. Defendant LEONA explicitly admitted in his Probable Cause Affidavit (PCA) that he observed this protected activity, stating: "The fact that Adam... [was] praying and refusing to sit down..." [Source: PCA DPD-24-0492].

132. Defendant LEONA then subjected Plaintiff to excessive physical force, including a forceful tackle, followed by multiple punches, and a custodial arrest.

133. A person of "ordinary firmness" would be deterred from practicing their faith or praying in their home if they knew the immediate consequence would be physical violence and incarceration by the police.

134. Defendant LEONA's own sworn statement provides the impetus for causation. He explicitly linked his perception of a "threat" to the Plaintiff's prayer. The PCA states: "The fact that Adam closed his eyes while I was speaking to him, praying and refusing to sit down, I believed he was getting ready to assault me..."

135. Hence, but for the Plaintiff's act of prayer, Defendant LEONA would not have categorized Plaintiff as a physical threat. The slow measured walk toward the bedroom was not a "lunge" or a threat, but a peaceful movement that Leona used as a pretext to act upon the retaliatory animus he formed while Plaintiff was praying while surrounded by Jewish talismans.

## NINTH CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### 14th Amendment (Religious Discrimination / Equal Protection)

### Against Defendants: LEONA

136. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

137. Plaintiff has a clearly established right to equal protection, and to be free of religious discrimination.

138. Plaintiff has a conservative Jewish background.

Complaint

139. Defendant Leona was physically surrounded by visible Jewish artifacts, including a large framed Hebrew Bible displayed prominently in the room in which Plaintiff was detained. Despite this clear context, Leona characterized a fundamental Jewish religious practice—closing one's eyes in prayer—as "bizarre behavior" and "getting ready to assault," even after being informed it was prayer. LEONA wrote directly: "The fact that Adam... [was] praying... I believed he was getting ready to assault me." By criminalizing the method of Jewish prayer, Leona demonstrated a specific animus toward Plaintiff's religious identity.

140. No reasonable officer perceives a person praying during a family emergency as an imminent physical threat. LEONA's decision to bypass all de-escalation and use a leg trip followed by punches on a restrained subject proves he viewed a Jewish person's religious observance as "threatening" in a way he would not have viewed a Christian's.

## TENTH CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS  (42 U.S.C. § 1983)

### 4th Amendment (Judicial Deception)

### Against Defendants: CITY OF DENTON, LEONA

141. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

142. Plaintiff had a clearly established 4th Amendment right to be free from perjury in legal documents supporting their arrest.

143. Defendant LEONA included multiple false statements in the Probable Cause Affidavit (PCA) knowingly or with reckless disregard for the truth. LEONA falsely swore under oath that Plaintiff (1) "was in the way while paramedics were trying to evaluate" Plaintiff's mother, (2) "lunged" toward the bedroom, (3) "ran into" police officers, (4) was "reaching" for a weapon, (5) that firefighters pointed at Plaintiff's waistband to indicate a concealed weapon, (6) that LEONA suspected of Plaintiff of having a weapon, (7) had to punch Plaintiff to force compliance with his orders. It also omitted (1) that Plaintiff was restrained by 3 officers at time of the use of force and (2) LOPEZ's "take him down" instruction.

144. The body camera footage shows that (1) Plaintiff was not "in the way" but rather standing silently, back to the wall, (2) Plaintiff did not "lunge" but rather walked slowly, (3) Plaintiff did not run into officers but was rather restrained by officers, (4) that Plaintiff did not have a weapon and was not reaching for one, (5) that no firefighters pointed at Plaintiff's waistband, (6) that Plaintiff asked to be frisked 3 times in order to make a phone call, and was denied each time by LEONA, and (7) that LEONA punched Plaintiff while Plaintiff was restrained without giving any kind of instruction.

145. By using the word "lunge," Leona intentionally chose a high-intensity "trigger word" to make a peaceful, concerned relative look like a violent threat to the Magistrate.

146. If one were to delete the false statements and add the "slow walk and prayer," they would

be left with: A concerned relative praying during a family emergency, who then walked slowly toward their sick mother's room- who had previously stood silently with their back to the wall- not probable cause. Therefore, the deception was "material." Without the lies, the Magistrate could not have legally signed the $5,000 bond order.

## ELEVENTH CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### 14th Amendment (Fabrication of Evidence)

### Against Defendants: CITY OF DENTON, LEONA

147. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

148. Plaintiff has a clearly established 14th amendment right to liberty and due process.

149. Defendant LEONA acted with **malicious intent and reckless disregard for the truth**. The sheer scope and volume of the misrepresentations does not lend itself to the possibility of honest mistake. The fabrications of a physical 'lunge', suspicion of Plaintiff possessing a weapon, of Plaintiff reaching for a weapon, etc. were a deliberate attempt to manufacture the elements of a crime (Interference) where none existed, to cover up LEONA's unlawful use of force.

150. This fabricated evidence was "material" to the decision to hold Plaintiff in jail and the bad-faith prosecution of Plaintiff.

151. As a result of the false evidence in LEONA's affidavit, Plaintiff suffered a loss of liberty (arrest, bond, and the burden of criminal defense and being stuck in Denton cases), and emotional distress.

## TWELFTH CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

### Conspiracy to Deprive Rights (Section 1983)

### Against Defendants: WEIGEL, HINZMAN, FLORY, KEIM, RAVEN, BURSON, MARTIN, HENSLEY, JOHNSON, REINWAND, DOES 1-10

152. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

153. Upon information and belief, the conspiracy was formed on or about February 2025, between Defendants HENSLEY and REINWAND (City), and JOHNSON (County/DA), acting personally or through their designated representatives acting under their direct command and authority, when HENSLEY and/or REINWAND initiated a request to Defendant JOHNSON and/or his designated Liaison to initiate a retaliatory prosecution against the Plaintiff. This request was made in direct retaliation for Plaintiff's February civil rights complaint and was intended to (1) provide the City with leverage against Plaintiff's civil rights complaints, (2) sabotage Plaintiff's pro se defense, and (3) obstruct Plaintiff's reports filed with the Department of Justice and the US Attorney's office.

154. Multiple facts point to a meeting of minds:

a) The 'Case Report Form' used to initiate prosecution was facially invalid, containing numerous blank fields for 'witnesses' and 'evidence.' The section that was supposed to be filled out by the DA was completely blank. This procedural bypass demonstrates that the DA did not rely on its normal intake procedures, and suggests they acted as a conduit for the City's legal objectives

b) The blatant contradictions between the Officer's PC Affidavit and the contemporaneous audio/video recordings were so obvious that any reasonable prosecutor would have immediately identified the perjury. The DA's decision to move forward despite this obvious fabrication- a mere 6 days after Inv. Sparby's confirmation that he would not investigate officer misconduct- suggests the existence of a conspiratorial agreement to prioritize municipal defense over the administration of justice.

c) Investigator MARTIN wrote a criminal complaint on March 12, 2025. According to the created-at fields in the discovery stipulation provided to Plaintiff's then-counsel Kevin Hinzman, body camera footage of the March 2 incident was not packaged until March 18, 2025 — 6 days after MARTIN filed the complaint. MARTIN therefore initiated prosecution without having reviewed the primary evidence of the alleged offense. MARTIN further stated to Plaintiff during a December 23, 2025 discovery viewing session that he had no knowledge of the case, despite having signed the charging document. These facts are consistent with charges

having been directed from above MARTIN rather than arising from his independent review of the evidence.

d) The meeting of the minds was further evidenced by the Defendants' blatant departure from the established protocol for handling officer misconduct as demonstrated in the October 23, 2025, indictments of Officers Foy and Hulslander. While the District Attorney's Office and DPD investigated tampering and oppression in that instance, they apparently bypassed this protocol in the Plaintiff's case.

e) On March 18, 2025, Plaintiff had submitted a litigation hold notice to JOHNSON directly. On Plaintiff's first court date, April 1, 2025, ADA Cecilia Weigel brought up the litigation hold notice in front of the presiding judge.

f) ADA Weigel raised the issue of competency at a July 28, 2025 status hearing, allegedly based on a recommendation from Plaintiff's court-appointed counsel, Kevin Hinzman, and his partner, Craig Flory. The meeting of minds between HINZMAN, FLORY and WEIGEL is established not by inference but by WEIGEL's own statements on the record at the July 28, 2025 hearing, in which she stated: 'I've spoken to Craig Flory and Kevin Hinzman... and they have urged me to do a State's motion for competency.' This communication occurred (1) four months after Plaintiff had ceased all contact with HINZMAN, (2) months after Plaintiff had filed a bar qcomplaint against HINZMAN in April 2025, and (3) on the first business day after Plaintiff viewed footage that revealed evidence tampering. HINZMAN never raised competency concerns during his representation of Plaintiff, and the only mention of competency or mental

health related notes in Plaintiff's complete case file was "Clean- No alcohol or drugs." His post-termination communications with the prosecution, urging a competency motion after 4 months of no contact, at the precise moment Plaintiff was positioned to expose evidence tampering, strongly suggests that HINZMAN abandoned his role as an advocate and joined the state's objective of suppressing Plaintiff's testimony regarding fabricated evidence. (Although court-appointed counsel generally does not act under color of state law, an attorney who conspires with state officials to deprive a client of constitutional rights is subject to § 1983 liability. *Tower v. Glover*, 467 U.S. 914 (1984). HINZMAN and FLORY's post-termination coordination with WEIGEL to advance a pretextual competency motion, after having no contact with Plaintiff for nearly 4 months, and at the precise moment Plaintiff was positioned to expose evidence tampering, constitutes such a conspiratorial deprivation)

g) Upon information and belief, the coordination between City and County Defendants extended beyond the prosecution itself to the active fabrication of evidence. Defendants HENSLEY and REINWAND, acting through the Civil Liability Response team pursuant to G.O. 401.8, participated in the conspiratorial agreement by directing the alteration of body camera footage in response to Plaintiff's civil rights complaints. Their participation is established by the chain of command documented in G.O. 401.8, the timing of the alterations following Plaintiff's May 20 City Auditor complaint, and the subsequent receipt and presentation of the altered materials by County Defendants as genuine, months after the County had already received unedited materials- an act that would have been inconceivable without prior coordination between City and County actors.

155. To establish a § 1983 conspiracy, Plaintiff must demonstrate (1) an actual deprivation of a constitutional right, (2) that two or more persons agreed to commit an illegal act, and (3) that the agreement caused the deprivation. Each element is satisfied here. The actual deprivations are Plaintiff's First Amendment right to petition and Fourteenth Amendment liberty and due process rights, which were directly curtailed by the retaliatory prosecution, evidence tampering, and competency proceedings described herein. The agreement is established by the facts set forth above in subsections (a) through (g). The overt acts in furtherance of that agreement are as follows:

a) Upon information and belief, in March 2025, JOHNSON, either personally or through his designated representatives acting under his direct command and authority, provided CECILIA WEIGEL with the litigation hold notice Plaintiff had addressed to him in March, and urged her to share it with Judge Beadle or otherwise caused it to be shared in court proceedings to influence the Court. No other mechanism by which WEIGEL could have obtained this document has been identified, as it was addressed solely to JOHNSON.

b) Upon information and belief, on or about March 11, 2025, six days after Inv. Sparby confirmed the DA would not investigate alleged officer misconduct, Defendant JOHNSON, either personally or through his designated representatives acting under his direct command and authority, directed JASON MARTIN to draft and file a criminal complaint against Plaintiff. MARTIN filed the complaint on March 12, 2025 without having reviewed the primary evidence of the alleged offense, as established by the "created-at" fields in the discovery stipulation showing body camera footage bearing dates of March 18, 2025, and MARTIN's own statement to Plaintiff that he did not know anything about the case.

c) On April 1, 2025, Cecilia Weigel brought up the litigation hold at an arraignment hearing. Judge Beadle instructed Plaintiff that a plea would not be entered, which remained a pattern throughout the case. It has been nearly 12 months since charges were filed, and Plaintiff has still not had an opportunity to enter a plea in the case.

d) Upon information and belief, on or about May 2025, following Plaintiff's May 20 complaint to the City Auditor, DPD Technicians and the Civil Litigation Team (DOES 6-10), acting at the instruction of the City Attorney's Office (DOES 1-5), digitally altered body camera footage of the March 2 incident. This included both the dubbing and stripping of audio, and the insertion of digital artifacts to attempt to preempt Plaintiff's claims in the complaint.

e) Upon information and belief, on or about May or June 2025, KEIM, BURSON, and RAVEN knowingly accepted these altered materials and began presenting them to Plaintiff as genuine during discovery viewing sessions, beginning June 11, 2025.

f) Upon information and belief, during discovery viewing sessions on June 11 (BURSON and RAVEN), and June 20, 2025 (KEIM), investigators knowingly engaged in a "tech support" charade while Plaintiff was present, claiming the videos were muted and required external assistance to fix, to conceal the secondary "Axon Respond" audio stream. (Axon body cameras have 2 audio streams, one for ambient audio, and one dedicated to communications. Switching between streams directly in front of Plaintiff would have conveyed the existence of the

secondary audio stream.) By concealing the existence of the secondary stream, investigators were able to withhold these communications from Plaintiff.

g) Defendant WEIGEL vouched for the fabricated evidence in a July 10, 2025 email to Plaintiff, claiming that the March discovery stipulation provided by HINZMAN was accurate and that all evidence was currently available for Plaintiff to view. Upon information and belief, this was done knowingly.

h) After Plaintiff viewed footage that was edited differently than the other videos ("Brock bodycam 2"), making the tampering obvious, WEIGEL moved for Article 46B Competency Proceedings the very next business day, at a routine status hearing. At the hearing, she introduced an altered discovery stipulation, with "created at" and "unique ID" fields removed, presigned by both Weigel and the presiding judge. Plaintiff alleges that upon information and belief that this was an overt act to (1) freeze the litigation and deprive Plaintiff of their ability to investigate the fraud, (2) create a pretext to prevent Plaintiff from timely testifying about the evidence tampering, and (3) remove the DA's liability by attempting to influence counsel newly-appointed by the Court per 46B, Camila Francino, to stipulate to fabricated evidence, as evidenced by the altered, signed discovery stipulation WEIGEL admitted into evidence as "State's Exhibit L."

h) Upon information and belief, on or about May 2025, JOHN DOES 6-10 of the Civil Liability Response team digitally altered the BWC footage while Plaintiff's litigation hold remained in effect, under the orders of JOHN DOES 1-5. Pursuant to G.O. 401.8, the Civil Liability

Complaint

Response team operates exclusively under the direction of Defendant REINWAND as legal counsel for the Department and under the supervisory authority of Defendant HENSLEY. The alterations therefore occurred within the chain of command established by G.O. 401.8.

156. The premeditated nature of the competency motion is further evidenced by the metadata of exhibits introduced at the July 28 hearing. Specifically, State's Exhibit A bears a print timestamp of 2:52 PM on July 25, 2025, less than two hours after Plaintiff departed the discovery viewing session at 1:00 PM that same day (documented in both Plaintiff's emails with Inv. Keim, and the State's Exhbit A itself, which was a log of notes regarding the discovery viewing sessions and other interactions). This timestamp demonstrates that WEIGEL began preparing the competency proceeding on the afternoon of July 25, contemporaneously with Plaintiff's viewing of the tampered footage, rather than as a good-faith response to a longstanding clinical concern. WEIGEL stated on the record that "the fact that we've discussed discovery and I've told him multiple times that I've turned everything over" was one of the stated "concerns" regarding competency, suggesting that the purpose of raising of competency was to preempt any allegations about evidence integrity following the July 25 discovery viewing.

157. Additionally, Plaintiff filed a Notice of Evidence Tampering with the Court on July 28, 2025, which included detailed transcriptions of discrepancies between the edits found in "Brock bodycam 2" viewed on July 25, and the previous versions, with corresponding timestamps. Plaintiff's Notice of Evidence Tampering was filed immediately following the July 28 hearing. However, Google Docs version history establishes that the Notice was substantially drafted prior to the hearing, demonstrating that Plaintiff's documentation of the tampering was contemporaneous and independent of the competency proceedings initiated by WEIGEL that same morning. Plaintiff maintains records of

this version history and will produce them in discovery to establish the pre-hearing drafting timeline. The presentation of a pre-prepared competency motion by WEIGEL while Plaintiff had pre-prepared a tampering notice corroborates that the competency motion was designed to preempt and suppress Plaintiff's tampering allegations rather than address a genuine clinical concern.

158. But for the illegal agreement between the City of Denton and the Denton County District Attorney's Office to "sanitize" the March 2 arrest and insulate the City from civil liability, the DA would have followed the standard intake procedures utilized in the Foy/Hulslander cases. In those cases, the DA rejected "inconsistent" evidence; here, they conspired to "manufacture consistency" through digital tampering and procedural bypass.

159. The Defendants' actions, particularly the digital tampering of evidence and the intentional bypass of established intake procedures, were investigative and administrative in nature, rather than preparatory to judicial proceedings. These acts occurred during the investigatory phase of the case to support a retaliatory prosecution. Furthermore, Defendant WEIGEL acted in an administrative capacity when she personally performed the technical task of altering the discovery stipulation (State's Exhibit L) to remove metadata fields. WEIGEL admitted on the record on July 28, 2025, that she personally performed these alterations, confirming that she was acting as a generator of evidence rather than a mere advocate for the State.

160. As a direct and proximate result of this conspiracy, Plaintiff was deprived of fundamental Constitutional rights, namely the 1st amendment right to file complaints, and the 14th amendment right

to liberty and due process. Plaintiff further experienced extreme emotional distress caused by the systematic misrepresentation of material evidence.

## THIRTEENTH CAUSE OF ACTION

### MONELL LIABILITY (42 U.S.C. § 1983)

### Against Defendants: City of Denton, County of Denton

161. Plaintiff re-alleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

### A. INADEQUATE SCREENING (City of Denton)

162. Prior to hiring Officer Leona on February 28, 2022, the City of Denton was required by the Texas Commission on Law Enforcement (TCOLE) to process and review Leona's eleven years of California peace officer service records to transfer his credentials.

163. These records contained documented evidence of Leona's prior unconstitutional conduct, specifically his involvement as a named defendant in Federal Case No. 1:21-cv-01417 (E.D. Cal.). That litigation alleged a specific, violent MO: Leona responded to a 911 call, arrested the caller for help instead of the perpetrator, and directed subordinates to punch and tase the victim while handcuffed.

164. Because the City was legally mandated to review these specific service records for the TCOLE transfer, the City actually possessed and reviewed the information detailing Leona's history of assaulting 911 callers.

165. The City's decision to hire Leona despite this actual knowledge constitutes deliberate indifference. A reasonable policymaker would conclude that the deprivation of a third party's federally protected rights- specifically the right to be free from unlawful detainment and excessive force after calling 911- was a plainly obvious consequence of hiring an officer with this specific, documented history of misconduct.

**In the Alternative: The City's Policy of Deliberate Blindness**

166. To the extent the City of Denton claims it was "unaware" of the contents of the California records in its possession, Plaintiff alleges such ignorance was the result of a deliberate municipal choice to bypass meaningful background scrutiny for out-of-state "lateral" hires.

167. Upon information and belief, the City of Denton maintains a custom or de facto policy of "rubber-stamping" lateral transfers to fill departmental vacancies quickly, intentionally failing to scrutinize the the relevant sections of TCOLE-mandated files.

168. This policy of willful blindness to a file the City was required to process is not mere negligence; it is a conscious disregard for the "plainly obvious" risk that hiring unvetted officers from other jurisdictions will result in constitutional violations, such as the specific injuries suffered by the Plaintiff on March 2, 2024.

**B. RATIFICATION**

169. The City of Denton exercises custody and control over the original Body-Worn Camera (BWC) footage of the March 2, 2024, incident through Axon's Evidence.com platform. On March 27, 2025, Plaintiff viewed this footage with attorney Kevin Hinzman, and at that time, the evidence was genuine and included Officer Leona's audible admission of charge fabrication ("What should I charge him with?"). This statement is is exculpatory evidence, as it demonstrates a lack of probable cause for the arrest.

170. On May 21, 2025, the City Auditor confirmed that the City's Investigation Committee—including the City Attorney's Office and HR Director—was briefed on Plaintiff's specific allegations of perjury and the "what should I charge him with?" audio.

171. On October 28, 2025, Plaintiff provided direct, actual notice to the Denton Police Chief Jessica Robledo, City Manager Sara Hensley, Mayor Gerard Hudspeth, and all of City Council, detailing the clumsy digital alterations made to the footage after the May briefing, and the verifiable perjury in Officer Leona's affidavit.

172. In the Fifth Circuit, ratification occurs when a final policymaker approves a subordinate's decision and the basis for it. See *City of St. Louis* v. Praprotnik, 485 U.S. 112 (1988). The failure to discipline, investigate, or even acknowledge the complaint after direct notice constitutes an official closing of ranks.

173. To the extent the Final Policymaker did not explicitly direct the evidence tampering, her subsequent approval of the Plaintiff's false arrest, the subsequent evidence tampering, and the basis for

it (infringing upon Plaintiff's 4th Amendment rights, and subsequently Plaintiff's due process rights during criminal proceedings, and thus thwarting civil litigation) constitutes an official ratification of the underlying violation.

174. In the alternative, under *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), Plaintiff alleges that this "closing of ranks" to protect tampered evidence constitutes an official policy of lawlessness, even if the Final Policymaker did not explicitly approve the evidence tampering.

### C. CUSTOM OF CONCEALMENT

175. Plaintiff alleges that the City engages in a custom of concealment of misconduct, including fabrication of evidence and fraudulent statements by multiple city officials and employees to government officials and agencies.

176. Plaintiff further claims the custom is well-settled. This is owing partly due to Plaintiff's experience with the City's attorneys in Cause No. 25-7897-442, 442nd District Court, in Denton County, Texas. This suit alleged, with substantiating audio recordings, photographs, and documentation, a pattern of evidence fabrication by City contractor staff within a TWC investigation, and a pattern of non-response by City officials (here, Plaintiff alleges upon information and belief that City officials directed the evidence fabrication as part of a custom of concealment). In this suit, the City's Deputy City Attorneys, Devin Alexander and Amanda Brown, were named as defendants for allegedly making fraudulent statements to Texas Workforce Commission investigators ("no federal funding") and the Texas Attorney General ("no responsive records"), respectively. Devin Alexander represented both himself and the City in this case, and filed a Plea to the Jurisdiction and Motion to Dismiss. In these

pleas, Alexander referred to the alleged false statements to investigators as taking an "adverse legal position" while using non-existent quotes from Plaintiff's petition with fabricated citations, and claimed that attorney immunity applied to RICO predicate acts. In responding to the Texas Workforce Commission and the Texas Attorney General, Defendants Alexander and Brown were not acting as legal advocates in a judicial proceeding, but as administrative agents and custodians of record performing investigatory functions.

177. Plaintiff further claims the custom is well-settled based on statements on the record from Denton County ADA Cecilia Weigel, where she claimed that another pro se defendant alleged having received doctored body camera footage, which Plaintiff alleges also originate with City officials.

178. City Manager Hensley's knowledge of the widespread custom of concealment is established through two independent channels. First, Plaintiff's direct written notices of July 28 and October 28, 2025 — copied to the United States Attorney's Office and the Department of Justice Civil Rights Division — documented specific instances of evidence tampering and false statements in this case. Second, Hensley was personally served as a named defendant in Cause No. 25-7897-442, which alleged in detail a similar institutional methodology — evidence fabrication during active civil rights investigations, false statements to government investigators, and bad faith invocation of litigation privilege — carried out by the same City Attorney's office in a concurrent civil rights context. Hensley therefore had actual notice not merely of isolated misconduct but of a pattern of institutional concealment spanning multiple civil rights investigations simultaneously. Hensley's deliberate silence across both matters — no investigation, no disciplinary action, no inquiry — despite actual notice of the same institutional methodology operating simultaneously in two concurrent civil rights matters,

establishes that the custom of concealment was not an aberration but an entrenched practice that she permitted to continue.

179. The City's custom of concealment was the moving force behind four distinct constitutional deprivations, each causally connected to the fabricated Probable Cause Affidavit produced pursuant to that custom. The custom of concealment was the moving force because it ensured officers and officials that fabricated evidence would be institutionalized and defended rather than investigated, thereby inducing the initial fabrication and subsequent alterations.

180. First, and most directly, Officer Leona's fabricated Probable Cause Affidavit was presented to a Denton County magistrate who made a probable cause determination based solely on its contents before setting bail. Because the affidavit's entire factual predicate was fabricated, containing six specific false statements directly contradicted by body camera footage, the magistrate's probable cause determination was constitutionally defective. Plaintiff was detained for one day based on a judicial finding of probable cause that would not have existed but for the fabricated affidavit.

181. This is not a case where fabricated evidence was one factor among many in a multi-source probable cause determination. The fabricated affidavit was the sole instrument before the magistrate. He had no independent factual basis from which to exercise judgment, rather he read what Leona wrote and signed the bond order. The causal chain is therefore direct and unbroken: Leona fabricated, the magistrate relied, Plaintiff was detained, thus authorizing pretrial detention

without actual probable cause in violation of the Fourth Amendment. No independent intervening act breaks this causal chain. The magistrate read what Leona wrote.

182. Second, the fabricated affidavit served as the sole legal instrument upon which the Denton County District Attorney relied to file criminal charges against Plaintiff over one year after the incident — charges filed eleven days after Plaintiff served a litigation hold notice. Without the fabricated affidavit no charge existed and no prosecution could proceed. The DA's filing of charges based on a fabricated affidavit is not an independent superseding cause that breaks the causal chain, rather it is the foreseeable and intended consequence of fabricating the affidavit. The affidavit was fabricated specifically to provide legal justification for an arrest that had already occurred without it. A prosecution based on that justification is not an unforeseeable intervening event, it is the completion of the causal chain the fabrication was designed to produce.

183. Third, the combination of the fabricated affidavit and the subsequent alteration of body camera footage — carried out after Plaintiff complained to the City Auditor and after a litigation hold was in effect — converted a warrantless arrest into a sustained prosecution by systematically eliminating the evidentiary record of the arrest's unconstitutionality. The unaltered body camera footage showing Officer Leona asking "what should I charge him with?" immediately after the arrest was some of Plaintiff's most direct exculpatory evidence. Its alteration after the litigation hold directly extended Plaintiff's liberty deprivation by removing some of the evidence most capable of defeating the prosecution.

184. Fourth, the alteration of exculpatory body camera footage pursuant to the custom of concealment directly impaired Plaintiff's ability to conduct a pro se defense in violation of their due process rights. As a pro se defendant without investigative resources, institutional support, or legal counsel, Plaintiff's defense depended entirely on the integrity of the evidentiary record. The deliberate alteration of body camera footage after a litigation hold was in effect — suppressing material exculpatory evidence in the case — converted Plaintiff's pro se defense into litigation against a falsified record rather than the actual events of March 2, 2024. This due process violation is distinct from and compounded by the due process violation arising from the same conduct.

185. In each of these four deprivations the causal chain is direct and unbroken. The custom of concealment did not merely provide background context for constitutional violations that would have occurred anyway — it was the mechanism by which a warrantless arrest became a magistrate-authorized detention, a magistrate-authorized detention became a criminal prosecution, a criminal prosecution was sustained by a falsified evidentiary record, and a pro se defendant was forced to litigate against fabricated evidence rather than the truth of what body cameras recorded on March 2, 2024.

### D. COUNTY POLICYMAKER LIABILITY

186. Defendant PAUL JOHNSON is the final policymaker for the Denton County District Attorney's Office with respect to prosecution decisions and evidence management. JOHNSON's direction of the retaliatory prosecution against Plaintiff at the request of City officials, as described in Count 14, constitutes an official act of County policy under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). A single unconstitutional decision by an authorized final policymaker subjects the municipality to § 1983 liability without requiring proof of a pattern or custom. The County is therefore liable for the constitutional deprivations caused by JOHNSON's direction of the conspiracy.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Adam Horwitz respectfully requests that this Court enter judgment in his favor and against Defendants, granting the following relief:

1. COMPENSATORY DAMAGES (ECONOMIC): An award for all out-of-pocket expenses, including but not limited to legal fees paid to prior counsel, bond costs, and medical expenses, lost wages/income, cost of future therapy/medical treatment, and ongoing costs of the criminal defense itself

2. COMPENSATORY DAMAGES (NON-ECONOMIC): An award for physical pain, respiratory distress, and severe mental anguish. This includes the profound loss of faith in public institutions and psychological trauma resulting from the coordinated fabrication of evidence and the presentation of doctored discovery materials, in addition to loss of liberty, injury to reputation, and ongoing fear and anxiety from the continued prosecution.

3. PUNITIVE DAMAGES: An award against Defendants LEONA, LOPEZ, BROCK, WEIGEL, KEIM, HENSLEY, REINWAND, and JOHNSON in their individual capacities. Punitive damages are warranted because their conduct demonstrates a reckless and callous indifference to Plaintiff's federally protected rights and a malicious intent to cause harm.

4. NOMINAL DAMAGES: In the alternative, should this Court find that Plaintiff has not established the full measure of compensatory damages, Plaintiff requests an award of nominal damages of $1.00 for each constitutional violation established at trial. Nominal damages are recoverable upon proof of a constitutional violation, and a nominal damages award constitutes a prevailing party judgment sufficient to support an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

5. DECLARATORY RELIEF: A formal declaration by this Court that the acts and omissions of the Defendants violated the Fourth and Fourteenth Amendments of the U.S. Constitution.

6. INJUNCTIVE RELIEF:

a) An Injunction against Defendant DENTON COUNTY and Defendant PAUL JOHNSON, in his official capacity, ordering the immediate production of unedited, raw, and non-digitally-altered body-worn camera footage

b) An injunction prohibiting further alteration or destruction of evidence by CITY OF DENTON and DENTON COUNTY

c) An injunction requiring preservation of all records related to the March 2 incident, including all versions of body camera footage, by CITY OF DENTON and DENTON COUNTY

d) An injunction against continuation of the retaliatory prosecution by DENTON COUNTY

6. ATTORNEY'S FEES AND COSTS: Plaintiff requests all costs of this suit and, should Plaintiff retain counsel, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, including fees for any counsel subsequently retained

7. OTHER RELIEF: Plaintiff requests such other and further relief, at law or in equity, to which they may be justly entitled.

**JURY DEMAND**

Plaintiff Adam Horwitz hereby demands a trial by jury on all issues so triable in this action pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**EXHIBITS**

Exhibit A – List of Defendants

**CERTIFICATION AND CLOSING**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 3/2/26

Adam Ellery Horwitz

Complaint